IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DENNIS STRONG,

    Plaintiff,

v.                                   Case No. 07-C-0086

STATE OF WISCONSIN,
MICHAEL VITACCO,
FRED SIGGELKOW,
GREG VAN RYBROEK,
DAVID POLLOCK, JAN GRAY,
BRAD SMITH, CLAIR KRUEGER,
JOHN FEENEY, KELLY A. VITENSE,
PATRICIA J. DORN, CHERYL J. MARSHALL,
LORI KLEMER, ERIN VALLEY,
AND CHERYL HOFFMAN,

    Defendants.

---

## FIRST AMENDED COMPLAINT

---

NOW COMES THE PLAINTIFF, Dennis Strong, by his attorneys, Gingras, Cates & Luebke, S.C., by Robert J. Gingras and Paul A. Kinne, who hereby states the following as his First Amended Complaint in the above-captioned matter.

### NATURE OF THE PROCEEDINGS

This is a civil action brought by the plaintiff seeking redress for state law tort claims (medical malpractice, assault and violation of state statutes protecting mentally ill persons) and federal law (the Fourteenth and Eighth Amendments to the United States Constitution and 42 U.S.C. sec. 1983) committed by the defendants against Strong.

## PARTIES

1.  Plaintiff Dennis Strong was at all times relevant hereto, an adult resident of the State of Wisconsin, and was an inpatient at the Mendota Mental Health Institute located at 301 Troy Drive, Madison, WI 53704.

2.  Defendant State of Wisconsin is a proper party defendant in this case due to its oversight of the Mendota Mental Health Institute and due to the actions of its employees/agents which are identified below.

3.  Defendants Michael Vitacco, Fred Siggelkow, Greg Van Rybroek, David Pollock, Jan Gray, Brad Smith, Clair Krueger, John Feeney, Kelly A. Vitense, Patricia J. Dorn and Cheryl J. Marshall. Erin Valley, Cheryl Hoffman, and Lori Klemer are all adult citizens of the State of Wisconsin whose business address is the Mendota Mental Health Institute ("MMHI"), 301 Troy Drive, Madison, WI 53704, and whose residences are not know to the Plaintiff at this time. At all material times herein, all of the defendants' actions described in this Complaint were taken within the scope of their employment and under color and authority of state law. Moreover, all of their actions set forth in this Complaint were taken in their individual capacities and were intentional.

### JURISDICTION AND VENUE

4.  This Court has jurisdiction over plaintiff's claims pursuant to 42 U.S.C. sec. 1983, the Eighth and Fourteenth Amendments to the United States Constitution, and the Substantive Due Process Clause and 28 U.S.C. §§ 1331 and 1343. This court has jurisdiction over the state law claims based upon 28 U.S.C. sec. 1367.

5.  Venue in the Western District of Wisconsin pursuant to 28 U.S.C. § 1391 is

proper insofar as the parties are or were located in this district, and the events giving rise to the claims took place within this district.

## FACTUAL ALLEGATIONS

6. On September 28, 2004, Strong met with persons from the Joint Commission on Accreditation of Healthcare Organizations at the Mendota Mental Health Institute ("MMHI") facilities. During this meeting, Strong spoke out about matters of a public concern concerning MMHI including but not limited to the following: the mistreatment of patients by staff; the threats and retaliation made by staff against patients for filing complaints and/or grievances internally and with the State Board of Regulation and Licensing; and the staff's description of patients as not being "real people". During this same meeting, Strong raised the above-described issues on behalf of not only himself but also all of the patients within MMHI.

7. On September 30, 2004 Feeney attempted to dissuade Strong from pursuing his rights and negatively implicated Governor Tommy Thompson in his efforts to chill Strong's rights.

8. On September 24, 2004, Strong requested Gray to provide him with names of certain staff members so that he could properly prepare a Notice of Claim in order to secure his legal rights. This request was denied by Gray on October 1, 2004.

9. On or about October 7, 2004, Strong executed and submitted a Notice of Claim against MMHI. In his claim, Strong spoke out about matters of a public concern and also specifically indicated that the names of the persons involved could not be disclosed entirely as said institute was not willing to provide him with the appropriate names.

10. In October of 2004, Attorney Maria Hanson refused to provide Strong with a Writ

3

of Mandamus form because she concluded that Strong was going to use said form against MMHI.

11. On October 13, 2004, The Wisconsin Coalition for Advocacy, the designated protection and advocacy group, wrote a letter to MMHI on behalf of Strong and spoke out about matters of a public concern including but not limited to Strong's prolonged confinement on a maximum-security unit. In said letter, The Wisconsin Coalition for Advocacy stated as follows:

> After reviewing Mr. Strong's file, it is apparent that staff on TRU and PTU often classified Mr. Strong's utilization of the grievance procedure as a behavioral problem. A number of progress notes construe his attempts to seek legal remedies as a threatening gesture against staff, and a behavior to be discouraged. This is of great concern to WCA, as it may have a chilling effect on patients' use of the grievance system access to this system is a legally protected right. The client rights system may lose its credibility if patients are condemned or sanctioned for exercising their right to file a grievance. WCA therefore asks that MMHI stress the importance of keeping grievances as a client rights issue, separate from treatment so that patients may file grievances without fear of retaliation.

One of the progress notes referenced in the proceeding paragraph by the Wisconsin Coalition for Advocacy was the note of John T. Feeney on July 8, 2004 which read in part as follows:

> Mr. Strong continued to state he has certain rights which he can exercise, such as filing grievances in an attempt to have staff members' licenses revoked. Mr. Strong was reminded that he is in a "one down" situation in which he needs to demonstrate consistently good judgement and appropriate response to directions/redirection from staff in order to have the opportunity to eventually transfer to medium security.

12. After learning of Strong's speech as described above, several of the defendants including but not limited to Vitacco made negative and threatening comments about Strong's speech and threatened retaliation for it.

13. Strong was discharged from MMHI in January of 2005 and returned to said facility in December of the same year. During that time, JCAHO decertified maximum security which resulted in the loss of federal funding.

14. In December of 2004, Strong witnessed Dorn having sexual relations with a patient.

15. On December 23, 2005, Vitacco confronted Strong and said to him that he had got word that Strong had done a chart review on December 21 and that Strong was writing names down from his record and that if Strong came to TRU with that shit that Strong would spend the duration of his stay on MTU, which is the most secure and restrictive unit not only in the facility but also in the State of Wisconsin.

16. Between January 20, 2006 and March 4, 2006, Kelly A. Vitense was employed at MMHI as a resident care technician. During this time, Dennis Strong was one of Ms. Vitense's patients.

17. During this period of time, Kelly A. Vitense, and without proper consent, had an improper sexual relationship with Mr. Strong; the sexual relationship began on January 20, 2006, progressed to intercourse by mid February, 2006, and continued on a regular basis until March 4, 2006.

18. Staff at MMHI, including but not limited to David Pollock and Erin Valley, knew or should have known of the sexual relationship during this period, but failed to report it.

19. During certain of these sexual encounters, Erin Valley kept a lookout to make sure that no other MMHI Staff caught Mr. Strong and Ms. Vitense in a sexual encounter.

20. Ms. Vitense's improper sexual relationship with Mr. Strong violated the duties of

and Clair Krueger, changed Strong's problem title from "non-compliance" to "challenging authority," which allowed them to sanction him every time he challenged authority, which he had done regarding the institution's repeated interference with his ability to communicate with legal counsel and Disability Rights of Wisconsin.

27. Dean Selje and Kim Scott refused to allow Strong to give documents to a member of the media in April or May, 2006. On May 4, 2006, the day after he received a visit from Jason Stein of the Wisconsin State Journal, Teresa Parks stated to him that there would be negative consequences for Strong and others for his continued contact with the media.

28. Strong does not now have access to the physical and mental therapy and treatment he needs for his conditions as a result of the retaliatory transfer to maximum security.

29. Patricia J. Dorn, and Cheryl J. Marshall intentionally sexually harassed Strong. Dorn's conduct, which took place from January - March, 2006, includes but is not limited to the following:

    A. In January of 2006, she talked to Mr. Strong about how long it had been since she had intercourse.

    B. In February 2006, she made repeated sexually explicit comments over the intercom to Strong while he showered, including comments about inspecting his genitals and masturbation.

    C. In February and March 2006, she referred to Kelly Vitense as Strong's "young pussy."

    D. She declined to engage in therapeutic activities with Strong, claiming that was what he had the "young pussy" for.

    E.    She told Strong that when he got a furlough pass she was going to take him home and make him dinner and "get [their] freak on," and "give [him] some lovin'."

    F.    On several occasions while walking ahead of Strong, she would intentionally stop in front of him and push her buttocks back into his groin area.

    G.    She provided Strong with gifts, groceries, and coffee, as unauthorized perks to him in an attempt to groom him for a sexual relationship.

30.    Marshall's conduct, which took place from January - March 2006, includes but is not limited to the following:

    A.    She repeatedly engaged in sexually explicit conversations with Strong. She described having only her dog and her vibrator to keep her happy, but that her vibrator was not enough to satisfy her needs.

    B.    She sometimes told Strong about a date she had been on, and the sexual activity that followed, and made it clear that she needed more than that to satisfy her sexual needs.

    C.    She told Strong that he could not imagine what a "freak" she was sexually, and what it would take to satisfy her.

    D.    She showed Strong her belly button ring of handcuffs, as well as undoing her pants to show him how she shaved her pubic area into a thin strip.

    E.    She also gave Strong her personal CD's and coffee from the staff break-room in order to groom him for a sexual relationship.

8

31. In late February 2006, Vitacco asked Strong, in reference to a tall, narrow flower vase that he had previously had in his room, if Strong used the vase to "shove up [your ass]." Vitacco also referred to the photographs of female friends and family members that Strong had on his bulletin board as "hoochies." On another occasion, Vitacco, while describing what Strong's problem was, gave him a piece of paper with the word "litigious" written on it.

32. Beginning in March of 2006 and continuing through the present time, Strong has spoken to Jason Stein of the Wisconsin State Journal concerning matters of a public concern including but not limited to improper sexual relationships between staff and patients that have occurred at MMHI and at Winnebago Mental Health Institute (WMHI). Stein has been investigating and reporting on the issue of improper sexual relationships between staff and patients at MMHI and WMHI has been aware of his investigation.

33. On May 25, 2006, an article appeared on the front page of the Wisconsin State Journal entitled "Allegation of Sex at Mental Institution".

34. In May of 2006, Siggelkow and Van Rybroek asked Strong to sign a release authorizing them to speak to the media about the issues described. Strong refused to sign such a release. At one point, Strong attempted to shake the hand of Van Rybroek, Van Rybroek refused and stated "I am not going to shake your hand."

35. On April 26, 2006, Disability Rights of Wisconsin (formerly the Wisconsin Coalition for Advocacy) wrote to Van Rybroek on behalf of Strong concerning MMHI's transfer of Strong to maximum security in March.

36. Said letter stated in part as follows:

Mr. Strong has been found to be mentally ill and in need of institutional

9

care. He was placed at MMHI to receive that care, and all staff at MMHI that come into contact with Mr. Strong have a responsibility to treat him in accordance with a professional and ethical standards. This entails recognition of the power differential that exists between staff and patients in an institutional setting, and the maintenance of appropriate professional boundaries. Any inappropriate relationship between staff and patients constitutes a breach of professional responsibility. Moreover, due to the power differential between patients and staff these relationships are never consensual, and lend themselves to a presumption of abuse and exploitation on the part of staff. When inappropriate relationships occur, the patient is always the victim. The patient is never responsible for the existence of the relationship, or for any acts related to the relationship. DRW is highly concerned about the way that MMHI has characterized the incident involving Mr. Strong. DRW would like to emphasize that staff are responsible for maintaining professional boundaries, and that patients do not bear a similar professional responsibility. As a patient, Mr. Strong is not responsible for the acts perpetrated against him by the staff person nor is he responsible for reporting these acts to MMHI. However, MMHI is essentially blaming Mr. Strong for the unethical and unprofessional conduct of a staff person. MMHI has held Mr. Strong responsible for the incident by classifying him as a safety/security threat, and transferring him to a maximum security unit.

37. Despite the letter from the Disability Rights of Wisconsin and the repeated requests by Strong to be placed in a less restrictive environment, MMHI has continued to hold Strong in a maximum security unit up until the present time in retaliation for the staff member having a sexual relationship with him and in further retaliation for Strong pursuing his first amendment rights with Jason Stein of the Wisconsin State Journal.

38. On May 20, 2006, Melody Berg made threatening comments to Strong regarding his prior contacts with the media when she essentially stated that he would not go to a less restrictive environment anytime soon as long as he was having contacts with the media. This statement by Berg were confirmed by Marlene Mook a co-employee who witnessed the statements.

39. On June 8, 2006, another article appeared in the Wisconsin State Journal

regarding the investigation by Jason Stein of the sexual misconduct at MMHI.

40. Vitacco has made threats to Strong throughout his confinement at MMHI including but not limited to comments such as "the only treatment you need is with a .357 magnum."

41. On August 9, 2006, Siggelkow, the forensic program director, issued a new policy which severely restricted Mr. Strong's access to legal representation and contact with his legal counsel via telephone conversations and face to face meetings. Since that time and as a result of said policy, Mr. Strong's ability to have interaction and contact with his criminal defense legal counsel, Richard E. Bollenbeck, has been severely limited. This has occurred on an ongoing basis. Those persons responsible for the implementation and enforcement of this policy as described below are not only Mr. Siggelkow but also James Yeadon, Teresa Parks, Greg Van Rybroek, Christie Machan, Jan Gray, Melody Berg, Laura Flood, and Cheryl Hoffman. Examples of said restrictions include but are not limited to the following:

    A. On July 17, 2006, Mr. Bollenbeck asked for 60-90 minutes of time to talk with Mr. Strong by telephone but his time was severely limited to his being disconnected from their telephone call on several occasions.

    B. On July 26, 2006, Mr. Bollenbeck had requested 60-90 minutes of time to talk with Mr. Strong but it was limited to 20 minutes by Melody Berg and Jan Gray.

    C. On August 1, 2006, Mr. Strong's attorney, Mr. Bollenbeck asked for 60-90 minutes of time to talk to him by telephone but it was limited to 20 minutes.

11

D. On August 9, 2006, Mr. Bollenbeck asked for two hours of time to talk to Mr. Strong by telephone but was limited to 30 minutes.

E. On August 16, 2006, Mr. Bollenbeck asked for 90 minutes of time to talk to Mr. Strong by telephone but was limited to 30 minutes.

F. Mr. Bollenbeck was denied total access to meet with Mr. Strong during the week of August 21, 2006.

G. On August 29, 2006, Mr. Bollenbeck asked for 90 minutes of time to talk to Mr. Strong by telephone but was limited to 30 minutes.

H. On August 30, 2006, Oscar Hernandez, Dwayne Gray, Dean Selje and Patrick Fencil told Mr. Strong to get off the phone when he had not violated any portion of the above described policy.

I. On August 31 and September 1, 2006, Mr. Bollenbeck was denied access to talk to Mr. Strong about his legal matters because he had allegedly exhausted his time to talk with him.

42. On several occasions, the following treatment staff including but not limited to Mark Herson, Ralph Watson, Paul Bretl, Melody Berg and Kim Scott ordered Strong to discontinue his telephone conversation with legal counsel even though he had not yet exhausted his 20 minutes of allowed time under the above referenced policy.

43. On May 21, 2006, psychiatric care technician Lori Klemer referred to Strong as having "bedroom eyes" in the progress notes of his medical records. This constitutes further evidence of mistreatment and a sexually harassing environment.

44. On June 7, 2006, Cheryl Hoffman, RN committed the following act: while

wearing latex gloves, Nurse Hoffman raised her hand, extended multiple fingers and stated "bend over" as she pulled on the latex with her other hand creating a snapping noise with the glove, clearly suggesting the performance of an unnecessary rectal examination to Mr. Strong.

45.     On June 12, 2006, Strong requested a less restrictive environment, and requested an explanation if a less restrictive environment was deemed not appropriate.

46.     On June 14, 2006, Teresa Parks placed an entry in Strong's medical record progress note which was false and a fabrication in order to defend herself from an allegation related to Mr. Strong's allegations of sexual battery and harassment.

47.     On June 26, 2006, Strong was presented with an updated Treatment Plan, signed by Hoffman, Dr. Brian Bradley, Gray, Teresa Parks, Brad Smith and Terri Statz.

48.     On June 30, 2006, Strong met with the above individuals identified in the preceding paragraph of the Clinical Treatment Team to seek specific clarification of the language used in the above noted Treatment Plan, pertaining to "threats" and "intimidation." Smith's response was "grievances," "lawsuits," and "providing documents to the media." The answer Smith gave was reiterated repeatedly throughout the discussion.

49.     On July 5, 2006, Strong made a request for a second opinion, pursuant to HFS 94.09(3)(a), and additionally asked that the institute explore the option of an opinion independent of the institute, pursuant to HFS 94(3)(c).

50.     On July 28, 2006, Sara Conklin violated the Client's Rights Grievance Resolution Process when she failed to uphold a grievance regarding alleged comments made by Melody Berg and which were confirmed by Marlene Mook. Specifically, on May 20, 2006, Melody Berg made comments to the effect that it was unlikely that Mr. Strong would receive the benefit of

future positive transfers or that he would be able to keep his current levels of privilege (implying that privileges would be taken away from him) because of his contacts with the media. Greg Van Rybroek as well as Laura Flood upheld the decision of Sara Conklin as to this grievance.

51. On August 14, 2006, Strong asked to be advised of the whereabouts of Dr. Gary Maier's report in response to his request of July 5, 2006 for a second opinion. Dr. Maier had previously stated during interviews with Strong that, "You need to let this all go, because it is only going to cause you grief."

52. On July 17, 2006, Maier stated that Strong actually seems to have greater trust in his attorney than he does in the TRAC 1 clinical team. It may be that his attorney should play a stronger up-front role in problem solving with him to take away some of the possible suspiciousness that might arise from any staff who believe that when he communicates with his attorney, it is about litigation against staff.

53. On August 21, 2006, Strong requested to be informed as to why he was still on a maximum security unit, and to be informed of what he needed to do to be moved to a less restrictive unit.

54. On September 19, 2006, James Tomony met with Strong and indicated to him that "your cooperation with this interview will likely give significant weight to administration's decision to determine the appropriateness for your return to medium security."

55. During said interview, Tomony asked several inappropriate questions such as "it must take special charm/skill to lead to a sexual relationship with staff". . . "don't you agree that patients, being all men often fantasize of sexual relationship with female staff". . . and "isn't it some sort of win to get your version to land on the front of the Wisconsin State Journal."

14

56. On October 20, 2006, Tomony asked Strong how many sexual partners he's had and other inappropriate questions.

57. On December 11, 2006, Strong again asked why he was still on a maximum security unit and Gray responded by referencing the treatment plan described previously.

58. The defendant's have denied Strong access to his own records because of his first amendment activities and because he has pursued his rights against MMHI.

59. As a direct and proximate result of the wrongful actions by the Defendants, the Plaintiff has suffered severe and permanent physical, emotional, psychological and economic injuries, been deprived of a proper course of treatment, been deprived of rights afforded to him under the Constitution and those rights afforded to him as a mental health patient, and has been subjected to a maximum security incarceration, all to his damage in an amount to be determined at trial. Such damages are permanent in nature.

60. On information and belief, the following individuals are employees and/or agents of the State of Wisconsin: James Tomony, Maria Hanson, John Feeney, Kelly A. Vitense; David Pollock; Erin Valley; Clair Krueger; Michael J. Vitacco; Jan Gray; Fred Siggelkow; Greg Van Rybroek; Cheryl Hoffman; Dr. Brad Smith; Tom Bretl; Sue Wanat; James Wilith; Dean Selje; Melody Berg; Kim Scott; Dr. Janice Munizza; Sheridan Schakelman; Patricia J. Dorn; Cheryl J. Marshall; James Yeadon; Teresa Parks; Christie Machan; Laura Flood; Mark Herson; Ralph Watson; Paul Bretl; Lori Klemer; Brian Bradley; Terri Statz; Sara Conklin; Marion Krzyzostanaiak; Oscar Hernandez; Dwayne Gray; Patrick Fencil; and, Dr. Gary Maier.

61. Mr. Strong has complied with the provisions of sections 893.80, Wis. Stats. and 893.82, Wis. Stats.

## FIRST CAUSE OF ACTION - FIRST AMENDMENT

62. This claim is brought against the Defendants Michael Vitacco, Fred Siggelkow, Greg Van Rybroek, David Pollock, Jan Gray, Brad Smith, Clair Krueger, John Feeney, under 42 U.S.C. §§1983 and the First Amendment to the United States Constitution, to redress the retaliatory treatment of plaintiff by defendants.

63. The plaintiff realleges and incorporates paragraphs 1 through 62 above as if set forth fully herein.

64. By engaging in the conduct set forth in this complaint, the defendant violated Strong's right to free speech and association when they retaliated against Strong for speaking out on issues of a public concern.

65. Said retaliation has caused Strong severe and permanent emotional, psychological and economic injuries.

66. The aforementioned conduct of defendants was carried out in a willful, wanton and/or reckless manner, and Strong is therefore entitled to the award of punitive damages to be determined by a jury.

## SECOND CAUSE OF ACTION – SEXUAL BATTERY

67. As and for his Second Cause of Action against the Defendants State of Wisconsin and Kelly Vitense, Plaintiff incorporates paragraphs 1 through 66 above as if set forth fully herein.

68. An employee of the State of Wisconsin, Kelly Vitense, identified above, intentionally and without proper consent, had sexual intercourse with, and engaged in other sexual touching of Mr. Strong.

69. As a direct and proximate result of the sexual contact, Mr. Strong suffered the injuries and damages outlined in paragraph 57 above.

70. As a result of the sexual contact outlined above by Ms. Vitense of Mr. Strong, Ms. Vitense and the State of Wisconsin are directly liable to Mr. Strong in an amount to be determined at trial. Vitense's conduct was carried out in a willful, wanton and/or reckless manner, and Strong is therefore entitled to an award of punitive damages to be determined by a jury.

### THIRD CAUSE OF ACTION - MEDICAL MALPRACTICE

71. As and for his Third Cause of Action against the Defendant State of Wisconsin and the individual Defendants, Michael Vitacco, Fred Siggelkow, Greg Van Rybroek, David Pollock, Jan Gray, Brad Smith, Clair Krueger, John Feeney, Kelly A. Vitense, Patricia J, Dorn and Cheryl J. Marshall, Plaintiff incorporates paragraphs 1-70 above.

72. By engaging in the conduct described in paragraphs 15 through 18, said Defendants committed medical malpractice against Strong. Said malpractice caused Strong to suffer severe and permanent emotional, psychological and economic injuries.

### FOURTH CAUSE OF ACTION – VIOLATION OF SEC. 51.61(7)(a)

73. As and for his Fourth Cause of Action against the Defendants State of Wisconsin, Michael Vitacco, Fred Siggelkow, Greg Van Rybroek, David Pollock, Jan Gray, Brad Smith, Clair Krueger, John Feeney, Kelly A. Vitense, Patricia J, Dorn and Cheryl J. Marshall, Plaintiff incorporates paragraphs 1 - 72 above.

74. By engaging in the conduct described above, the Defendant State of Wisconsin, through the actions and inactions of the above named employees/agents of the State of

17

Wisconsin, unlawfully denied and/or violated the rights of Mr. Strong, as those rights are outlined in sec. 51.61, Stats. and specifically 51.61(1)(m)(p)(u)(x), 51.61(5)(d), 51.61(1)(F) as well as 51.61(1)(N), and Mr. Strong suffered damage as a direct result therefrom (as outlined in paragraph 57, above), making the State of Wisconsin directly liable to Mr. Strong in an amount to be determined at trial, together with exemplary damages for each violation, with costs and reasonable attorney fees.

### FIFTH CAUSE OF ACTION – VIOLATION OF SEC. 51.61(7)(b)

75. As and for his Fifth Cause of Action against the Defendants State of Wisconsin, Michael Vitacco, Fred Siggelkow, Greg Van Rybroek, David Pollock, Jan Gray, Brad Smith, Clair Krueger, John Feeney, Kelly A. Vitense, Patricia J, Dorn and Cheryl J. Marshall Plaintiff incorporates paragraphs 1 - 74 above.

76. By engaging in the conduct described above, the Defendant State of Wisconsin, through the actions and inactions of the above named employees/agents of the State of Wisconsin, willfully, knowingly and unlawfully denied and/or violated the rights of Mr. Strong, as those rights are outlined in sec. 51.61, Stats. and specifically 51.61(1)(m)(p)(u)(x), 51.61(5)(d), 51.61(1)(F) as well as 51.61(1)(N), making the State of Wisconsin directly liable to Mr. Strong in an amount to be determined at trial, together with exemplary damages for each violation, with costs and reasonable attorney fees.

### SIXTH, SEVENTH AND EIGHTH CAUSES OF ACTION - VIOLATION OF SEC. 1983

77. As and for his Sixth, Seventh and Eighth Cause of Action against the individual Defendants Michael Vitacco, Fred Siggelkow, Greg Van Rybroek, David Pollock, Jan Gray, Brad Smith, Cheryl Hoffman, Clair Krueger, John Feeney, Kelly A. Vitense, Patricia J, Dorn,

Erin Valley, Lori Klemer, and Cheryl J. Marshall, Plaintiff incorporates paragraphs 1 - 76 above.

78. The wrongful actions of the above named Defendants, all of whom acted under color and authority of state law, have caused the Plaintiff: (1) to be deprived of liberty without procedural or substantive due process of law in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, which is contrary to, and actionable under, 42 U.S.C. §1983 and (2) subjected to cruel and unusual punishment in violation of the 8th amendment to the United States Constitution.

79. In further violation of 42 U.S.C. sec. 1983, defendants Kelly Vitense, Erin Valley, Lori Klemer, Cheryl Marshall and Cheryl Hoffman harassed and assaulted Strong on account of his sex.

## NINTH CAUSE OF ACTION AGAINST ALL INDIVIDUAL DEFENDANTS - PUNITIVE DAMAGES

80. As and for his Eighth Cause of Action against the individual Defendants Michael Vitacco, Fred Siggelkow, Greg Van Rybroek, David Pollock, Jan Gray, Brad Smith, Clair Krueger, John Feeney, Kelly A. Vitense, Patricia J. Dorn and Cheryl J. Marshall, Plaintiff incorporates paragraphs 1 - 79 above.

81. The above described conduct of the individual Defendants was carried out in willful, wanton and/or reckless manner, and Strong is therefore entitled to an award of punitive damages to be determined by a jury.

WHEREFORE, the Plaintiff prays that the Court grant him judgment against the Defendants, jointly and severally, awarding him:

  a. compensatory damages in an amount deemed proper by the Court;

    b.      punitive damages in an amount deemed proper by the Court;

    c.      his costs and disbursements incurred herein, including actual attorneys' fees; and,

    d.      such other and further relief as the Court deems just and proper.

PLAINTIFF DEMANDS A TRIAL BY A JURY OF SIX CITIZENS

Dated this _20th_ day of April, 2007.

> GINGRAS, CATES & LUEBKE, S.C.
> 8150 Excelsior Drive
> P.O. Box 1808
> Madison, WI 53701-1808
> (608) 833-2632
>
> By: _/s/ Paul A. Kinne_
> Robert J. Gingras
> State Bar No. 1002909
> Paul A. Kinne
> State Bar No. 1021493
> Attorneys for Plaintiff