IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DENNIS STRONG,

                        Plaintiff,

        v.

STATE OF WISCONSIN, MICHAEL VITACCO,
FRED SIGGELKOW, GREG VAN RYBROEK,
DAVID POLLOCK, BRAD SMITH, KELLY VITENSE,
PATRICIA DORN and CHERYL MARSHALL,

                        Defendants.

OPINION and ORDER

07-cv-86-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

       Plaintiff Dennis Strong was an involuntarily committed patient at the Mendota Mental Health Institute in Madison, Wisconsin.  In this suit brought under 42 U.S.C. § 1983 and state law, plaintiff contends that staff at the institute subjected him to a litany of sexual abuse, harassment and retaliation.  The parties' cross motions for summary judgment are ripe for review.

       The focal point of the case is plaintiff's claim that defendant Kelly Vitense, a "resident care technician" at the institute, sexually abused him for a period of six weeks in the winter of 2006. Discerning plaintiff's remaining claims is not as straightforward as it

1

might be. What is clear from plaintiff's multiple requests for partial voluntary dismissal, dkt. ## 82 and125, is that he has had no small amount of difficulty identifying his most promising claims. Plaintiff does not state explicitly anywhere in his summary judgment materials which claims he continues to assert, but his response brief includes at least a mention of the following claims:

• defendant Kelly Vitense sexually abused him, in violation of the due process clause, Wis. Stat. § 51.61 and state laws against medical malpractice and assault and battery;

• defendant State of Wisconsin violated his rights under § 51.61 through the actions of defendant Vitense;

• defendants Patricia Dorn, Cheryll Marshall and Erin Valley were aware of Vitense's sexual abuse and failed to protect him, in violation of the due process clause;

• defendant Dorn sexually harassed him, in violation of the equal protection clause;

• defendants Fred Siggelkow, Greg Van Rybroek, Michael Vitacco, Brad Smith and David Pollock retaliated against him for exercising his rights under the First Amendment;

• plaintiff's conditions of confinement violated the due process clause and Wis. Stat. § 51.61;

• "the defendants" limited plaintiff's visits with his lawyer, in violation of his right to have access to the courts.

Plaintiff has moved for summary judgment on his claims against defendant Vitense.

2

The defendants have moved for summary judgment on most of the remaining claims identified above as well as other claims plaintiff had identified in his complaint.  In his response brief, plaintiff ignored a number of the claims for which defendants are seeking summary judgment, which I understand to mean that he has abandoned those claims. Wojtas v. Capital Guardian Trust Co., 477 F.3d 924, 926 (7th Cir. 2007); Cincinnati Insurance Co. v. Eastern Atlantic Insurance Co., 260 F.3d 742, 747 (7th Cir. 2001).

Plaintiff has forfeited a number of other claims.  First, I agree with defendants that plaintiff failed to give the required notice under Fed. R. Civ. P. 8 of his claims that defendants Dorn and Marshall were aware of defendant Vitense's sexual abuse and failed to take reasonable measures to stop it.  Plaintiff included no allegations in his complaint that either Dorn or Marshall had any knowledge of Vitenses's actions.  Although plaintiff did allege that *other* defendants were aware, each defendant is entitled to notice of the claims against her.  EEOC v. Concentra Health Services, Inc., 469 F.3d 773, 776 (7th Cir. 2007) ("[T]he complaint must describe the claim in sufficient detail to give *the defendant* fair notice of what the . . . claim is and the grounds upon which it rests.") (emphasis added and internal quotations omitted).  In fact, by specifically identifying in his complaint some defendants on his failure to intervene claim and not others, plaintiff communicated to the defendants not included in the list that they were off the hook.  If plaintiff gathered additional evidence during discovery implicating other defendants, he should have amended his complaint.

3

Second, it is not clear from plaintiff's brief whether he intends to assert retaliation claims against any of the defendants for conduct that occurred during his first detention at the institute in 2004 or whether he simply means to rely on that conduct to help prove defendants' retaliatory intent in taking certain actions during his second stay.  To the extent he intends to include a separate claim, I agree with defendants that he failed to provide notice of it in his complaint, which includes allegations of retaliation regarding his second detention only.

Third, plaintiff has forfeited any claims he may have had challenging his conditions of confinement as too harsh and restrictive in violation of the due process clause and Wis. Stat. § 51.61.  Despite the factual and legal complexity of such claims, plaintiff develops no argument in support of them.  Pruitt v. City of Chicago, Illinois, 472 F.3d 925, 930 (7th Cir. 2006) (party forfeited arguments by "devot[ing] only a sentence or two to each").  With respect to his due process claim, plaintiff does little more than list his conditions at the institute.  He does not address any of the factors relevant in determining whether a patient has been subjected to unconstitutional "punishment," such as whether defendants had a nonpunitive justification for the restrictions and whether the deprivations were sufficiently serious to implicate the due process clause.  Sain v. Wood, 512 F.3d 886, 893-94 (7th Cir. 2008).  Worse, he does not identify which defendants may be held liable for this claim.  What little authority he does cite is irrelevant to his claim.  Of the two cases he cites, one

4

involves questions of state law and the other involves procedural due process, even though it is clear that plaintiff is challenging the conditions themselves and not the lack of process he received before being placed in those conditions.

With respect to his claims that his conditions violated § 51.61, plaintiff simply identifies seven provisions of the statute followed by a conclusion that certain conduct violates the provision.  But the provisions he cites are not so clear cut: they guarantee rights to "adequate treatment," § 51.61(1)(f), "reasonable access to a telephone" § 51.61(1)(p), and similarly ambiguous matters.  To preserve his claims, plaintiff needed to do more than cite the statute.

Plaintiff's remaining claims are discussed below.  Because he has failed to show that he is entitled to judgment as a matter of law on any of his claims, plaintiff's motion for summary judgment will be denied in full.  This means that most of plaintiff's claims against defendant Vitense must proceed to trial along with his claim against defendant State of Wisconsin under § 51.61 that is derived from defendant Vitense's alleged sexual abuse of plaintiff.  However, I am granting summary judgment to defendant Vitense on plaintiff's medical practice claim because she is not a health care provider and cannot be sued for malpractice.

I conclude that plaintiff has shown a genuine issue for trial with respect to his claims that defendant Dorn harassed him because of his sex and that defendants Siggelkow, Van

5

Rybroek and Pollock retained plaintiff in the maximum security unit in retaliation for his exercise of his First Amendment rights.  Defendants' motions for summary judgment will be granted in all other respects.

From the parties' proposed findings of fact and the record, I find the following facts to be undisputed.  (In their reply brief, dkt. #233, defendants ask the court to strike the statement of facts in plaintiff's brief because plaintiff did not provide citations to the record in violation of "Civ. L. R. 56.1."  Defendants' request is puzzling because this court has no such rule.  In fact, this court's summary judgment procedures state expressly that the court will not consider facts contained only in a brief.  Procedure to be Followed on Motions for Summary Judgment, I.B.4.  Thus, it makes little difference whether plaintiff included citations to the record in his statement of facts because I did not rely on that statement in deciding the motions for summary judgment.)

UNDISPUTED FACTS

A.  First Detention at Mendota Mental Health Institute

Plaintiff Dennis Strong has been involuntarily committed for mental health reasons at least 10 times.  On December 18, 2003, he was found not guilty of false imprisonment and battery by reason of a mental disease or defect.  As a consequence, he was committed involuntarily to the Mendota Mental Health Institute, which is operated by the state of

Wisconsin.  Plaintiff was part of the forensic program, meaning that he could not be released from the institute without a court order.  His mental health diagnosis was paranoid schizophrenia.

Plaintiff was publicly critical of the institute and the conditions there, including the maximum security unit, where he was sometimes held.  In August 2004, plaintiff filed a notice of claim in which he contended that defendant Fred Siggelkow, director of forensic services, had violated his privacy rights.  A month later, plaintiff met with representatives of the Joint Commission on Accreditation of Healthcare Organizations to complain about his treatment.  Sigglekow knew about plaintiff's notice of claim and the meeting with the joint commission.  (The parties dispute whether defendants Michael Vitacco and David Pollock confronted plaintiff immediately after the meeting, asking him why he met with the commission.)

In October 2004, defendants Siggelkow and Greg Van Rybroek (the director of the institute) received a letter from the Wisconsin Coalition for Advocacy, criticizing institute staff for treating plaintiff's use of the grievance system as a behavioral problem and for relying on "allegations later found to be false" to justify plaintiff's placement in maximum security.  (The parties do not propose facts regarding the events that provided the impetus for this letter.)

Defendant Michael Vitacco is a "psychological associate" who treats patients at the

7

institute.  Vitacco told plaintiff when he was discharged that he "better duck and hide" if he returned to the institute.  (Vittacco says he meant the comment "as a joke.")

In January 2005, plaintiff was released from the institute.

### B.   Second Detention at the Mendota Mental Health Institute

Plaintiff returned to Mendota Mental Health Institute in December 2005 after being found not guilty of disorderly conduct, damage to property, battery and negligent use of a weapon by reason of mental disease or defect.   Again, plaintiff's commitment was involuntary.  After a short stay on maximum security, plaintiff was moved to the medium security treatment and rehabilitation unit on January 3, 2006.  Defendant David Pollock was the manager of this unit.

### 1.  Interactions with Kelly Vitense

Defendant Kelly Vitense began working at the institute in May 2005 as a resident care technician and was assigned to the treatment and rehabilitation unit while plaintiff was housed there.  Her primary responsibility was to assist patients with daily activities.  In addition, she participated "in the development and implementation of treatment plans and therapeutic activities . . . to provide a basis on which care is conducted and to assure promotion and reinforcement of socially acceptable behavior."   She did not provide

8

counseling to patients.

In January 2006, defendant Vitense and plaintiff began playing "footsie" with each other during a game of dominoes. (The parties dispute whether plaintiff or Vitense initiated physical contact.) Vitense used her foot to "carres[s]" plaintiff's leg, including his inner thigh.

Within three days, Vitense kissed plaintiff on the lips in the storage closet; a few days later, she kissed him again in front of his room. After that, the kissing became more frequent, occurring almost every day Vitense worked at the institute. This included French kissing. Defendant Vitense kissed and groped plaintiff in front of defendant Erin Valley, another resident care technician and a "good friend" and house mate of defendant Vitense. (The parties dispute whether Vitense asked plaintiff to reach under the table and feel how "wet" she was, whether Vitense masturbated plaintiff, whether she performed oral sex on him and whether they had intercourse as many as 10 times over the next several weeks.) Plaintiff was confused by what was happening with defendant Vitense and believed it was wrong.

Vitense began calling plaintiff from home. During these conversations, Vitense would tell plaintiff that she was sexually aroused, that her "pussy was wet" and that she was masturbating.

On March 4, 2006, defendant Vitense was in the kitchen with plaintiff using a knife

9

to assist in meal preparation.  Both defendant Valley and a nurse witnessed this.  The nurse reported what she saw to defendant Pollock.

## 2.  Transfer to maximum security

Defendant Siggelkow started an investigation in response to the nurse's report.  The initial focus was the allegation that defendant Vitense had a brought a knife to the institute in violation of policy.  However, another patient told Siggelkow that he had seen plaintiff kissing defendant Vitense.  Defendant Siggelkow concluded that plaintiff and Vitense likely had "crossed appropriate staff boundaries" and that additional investigation was needed.

On March 5, 2006, defendant Pollock met with plaintiff.   When Pollock asked plaintiff whether he was aware of any inappropriate conduct, plaintiff did not say anything about his relationship with Vitense.  To insure that plaintiff and Vitense did not interact during the investigation, Pollock decided to transfer plaintiff to a different unit.  Because the other medium security units at the institute did not have any available space, Pollock moved plaintiff to a maximum security unit.

Plaintiff met with defendant Pollock again on March 6 and March 7.  Plaintiff continued to deny any inappropriate contact with defendant Vitense.  Pollock concluded that defendant Vitense had brought in a knife that was contraband and that Vitense's conduct in the kitchen with plaintiff was "suspicious."

10

Defendant Siggelkow approved plaintiff's transfer to the maximum security unit on March 8. Defendant Van Rybroek played no role in the transfer decision, but he "concurred" in the placement. Both Van Rybroek and Sigglekow have the authority to move patients from one level of security to another, but defendants Brad Smith and Vittacco do not.

On March 9, 2006, defendant Vitense left her employment with the institute. Plaintiff was not returned to a medium security unit at that time, even though the need to separate plaintiff and Vitense was defendant Pollock's initial justification for the transfer.

(Defendants proposed as a fact a progress note that defendant Pollock wrote on March 9, 2006 explaining the reasons for "transfer of pt to a more secure unit." Dfts.' Prop. Find. of Fact, dkt. #95, at ¶52. However, the proposed finding does not identify who the patient is and the record citation defendants provide for the proposed fact does not include the alleged progress note.)

In comparison to the medium security unit, plaintiff's freedom on the maximum security unit was more restricted, his limitations on property were greater, his telephone privileges were fewer, he received no "one-on-one" counseling and he was unable to attend treatment such as the men's issues group and the dialectical behavioral therapy group.

3. Contacts with the Wisconsin State Journal

11

Plaintiff first contacted the Wisconsin State Journal during the first half of March 2006.  On  May 3, Wisconsin State Journal reporter Jason Stein met with plaintiff at the institute.  On May 25, the State Journal ran a front page story with the headline, "Allegation of Sex at Mental Institution."  The article disclosed an alleged sexual relationship between plaintiff and an institute staff member and plaintiff's subsequent transfer to maximum security.  In the article, both plaintiff and a staff attorney for Disability Rights Wisconsin "raised questions about Strong's transfer to the maximum-security unit."  A second article appeared on June 8, "Second Mendota Employee Resigns."

Defendants Siggelkow, Van Rybroek and Vitacco read these articles and found them to be critical of the institute.  Both Siggelkow and Van Rybroek were concerned about negative publicity associated with the articles.  Vitacco discussed the articles with Siggelkow and Van Rybroek, saying he believed they were one-sided.   Siggelkow concluded that plaintiff was being "inconsistent" after reading the articles.

Defendant Van Rybroek met with plaintiff in an attempt to get plaintiff to sign a release allowing institute staff to speak to the media, but plaintiff refused.  At the end of the meeting, Van Rybroek refused to shake plaintiff's hand.  (The parties dispute whether Van Rybroek told plaintiff that he could return to medium security when he "stopped filing complaints.")

Defendant Brad Smith was the director of forensic psychiatry at the institute; he

12

treated plaintiff from March 2006 until August 2006. Smith discussed with plaintiff the possibility that the newspaper articles were causing him increased anxiety. (The parties dispute whether Smith told plaintiff not to talk about his sexual relationship with defendant Vitense.) In a June 30, 2006 meeting, Smith called plaintiff "intimidating." (The parties dispute whether Smith said plaintiff was intimidating because he filed grievances and provided documents to the media and whether it was these actions that were keeping him in the maximum security unit.) Smith told plaintiff about "staff concerns" that plaintiff was using grievances and threats to file a lawsuit "to get what he wanted." Siggelkow also considered plaintiff "initimidating" because "he would want staff to know he was litigating many different things."


5.  Remainder of plaintiff's confinement at the institute

On May 3, 2006, plaintiff met with defendant Pollock, who wrote the following notes:

>    I indicated Fred S[iggelkow] had directed me to "state the reason for the transfer [to maximum security], specifically relating to your behavior."
>    . . . You state in multiple ways that you were aware of no rule violations, inappropriate relationships, or behaviors by any TRU staff including Kelly [Vitense] that involved you or occurred near you.
>    In fact, contraband, a knife, was used by Kelly right in front of you during a portion of the meal preparation.
>    This still comes down to safety, security, and trustworthyness [sic].

13

Plaintiff complained to Jan Gray about his retention in maximum security. In unit manager meetings, Gray recommended to Siggelkow that plaintiff be transferred back to medium security but each month the decision was to retain plaintiff on the maximum security unit.  Siggelkow believed the investigation into plaintiff's relationship with defendant Vitense was never completed because plaintiff refused to talk about it.

Defendant Pollock told plaintiff that he would remain on the maximum security unit so long as plaintiff continued to file grievances. (Although defendants disputed this fact, they did not cite any evidence to support their version, so I consider it to be undisputed.)

In August 2006, Siggelkow enacted a policy that limited plaintiff's time with his lawyer to a one-hour visit and a 30-minute telephone conversation once every week. Plaintiff's lawyer requested additional time on at least 23 occasions but these requests were denied every time.

Plaintiff's November 2006 treatment plan included the following language:

**Criteria for Movement to Less Restrictive/Discharge:**

. . . .

Less restrictive unit – [when] deemed to not be a danger to self, other, or property and when deemed to have established a level of trust necessary for a medium security setting

. . . .

Mr. Strong needs to learn how to act in pro-social ways that do not disrupt the environment, incite his peers, violate rules, or jeopardize the safety or dignity of

others.  Mr. Strong needs to learn how to address his concerns to authority figures without resorting to methods [which] lead others to feel coerced, hounded, harassed, intimidated, threatened, or otherwise bullied.

In October 2006, a psychologist at the institute prepared a "Risk Assessment Psychology Report" regarding plaintiff.  The psychologist concluded that retaining plaintiff on a maximum security unit was "warranted and appropriate."

Vitense continued to call plaintiff at the institute, but he told her that her calls were not healthy for his treatment. In November 2006, plaintiff obtained a restraining order against defendant Vitense after she continued to call him at the institute and sent "associates" to visit him.

Plaintiff stayed in maximum security until his release from the institution.  The "final" decision whether to move plaintiff back to medium security was defendant Siggelkow's.

Plaintiff was discharged from the institute on July 10, 2007.


DISPUTED FACTS

In addition to the disputed facts noted above, the parties genuinely dispute the following facts.

With respect to defendant Patricia Dorn (another resident care technician at the

institute), the parties dispute whether from January 2006 to March 2006 defendant Dorn made sexually explicit comments to plaintiff while he was showering and whether Dorn discussed her sex life with plaintiff in graphic detail.  In particular the parties dispute whether Dorn made the following remarks to plaintiff:

- she was lonely and only had "her two dogs . . . and a vibrator to pleasure herself sexually";

- she was a "freak" sexually and owned handcuff naval rings;

- plaintiff "would not believe what kind of pain she could take in bondage type sexual activities";

- on multiple occasions, that plaintiff should "scrub his balls clean but not too hard so he'd get a hard on";

- plaintiff was defendant Vitense's "young pussy";

- she wanted to "take [plaintiff] home, make dinner, get their freak on and give him some loving";

The parties also dispute whether defendant Dorn took the following actions:

- on multiple occasions, abruptly stopped while walking in from of plaintiff and pushed her buttocks into his groin;

- showed plaintiff her pubic area when standing in front of his doorway after telling plaintiff that she had shaved it;

16

• had sex with another male patient in front of plaintiff.

With respect to defendant Valley, the parties dispute whether she acted as a "lookout" for Vitense when she was having sex with plaintiff and whether Valley saw plaintiff and defendant Vitense kissing and engaging in sexual intercourse.

With respect to defendant Vitacco, the parties dispute whether Vittacco told plaintiff that

• his "problem was that [he] was litigious";

• "the only treatment [he] needed was a .357 magnum";

• "somebody need[ed] to take [him] out back and shoot him";

• he "should not show his fucking face again";

• if he returned and expressed any criticism of his care, he would "complete the duration of his stay on maximum security";

• he "gets critical of the care he receives and files complaints";

• "all good things between [us have] ended."

In addition, plaintiff testified that Vitacco asked him whether he used a narrow, tall vase to "shove up his ass."

OPINION

A.  <u>Sexual Abuse by Defendant Vitense</u>

17

I begin with the claim that gives rise to many of the others, which is plaintiff's claim that defendant Kelly Vitense sexually abused him over a six-week period in 2006.  Plaintiff contends that Vitense violated his right to bodily integrity under the due process clause, that she violated his rights as a patient under Wis. Stat. § 51.61 and that she committed medical malpractice and an assault and battery against him under state law.  Plaintiff has moved for summary judgment on all of these claims.  Although defendant Vitense (who is proceeding pro se) has not filed a response to plaintiff's motion, defendant State of Wisconsin has opposed the motion on Vitense's behalf and has filed its own motion for summary judgment on plaintiff's medical malpractice claim.

A preliminary issue is raised by plaintiff's motion to "strike" the materials submitted by the state on the ground that counsel for the state is not representing Vitense.  Although I understand that plaintiff would prefer that his motion for summary judgment be deemed unopposed, I disagree with his view that I may not consider the state's submissions.  With respect to the factual disputes identified by the state in its responses to plaintiff's proposed findings of fact, this court's summary judgment procedures do not limit the facts a party may dispute to those directly relating to that party only.  The purpose of proposed findings of fact is to provide an efficient way of identifying which facts are truly disputed; it does not matter who identifies the disputes.  Plaintiff has no basis for objecting when one party notifies the court that another party has testified in a manner that contradicts plaintiff's version of

18

events. Rather, it would undermine the truth-finding function of this court to disregard genuinely disputed facts simply because the "wrong" party pointed out that a dispute exists.

Similarly, I see no valid objection to considering the legal arguments raised by the state.   Even when a motion for summary judgment is unopposed and the facts are undisputed, the moving party must still show that he "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Doe v. Cunningham, 30 F.3d 879, 883 (7th Cir. 1994); Glass v. Dachel, 2 F.3d 733, 739 (7th Cir. 1993); Wienco, Inc. v. Katahn Associates, Inc., 965 F.2d 565, 567 (7th Cir. 1992).   In other words, the moving party has no right to a legally incorrect ruling.   Regardless whether the nonmoving party opposes the motion, the court must determine whether the law requires a judgment in the moving party's favor. Because the court's goal is to decide the law correctly, it would be foolish to ignore assistance provided by any party (or even a nonparty in the case of amicus briefs) in reaching that goal. Further, if the law shows that the moving party cannot prevail on his claim, a court may enter summary judgment against that party, so long as he had a full opportunity to present his evidence and arguments.   Sims-Madison v. Inland Paperboard & Packaging, Inc., 379 F.3d 445, 449 (7th Cir. 2004).   Plaintiff cites no law to the contrary.

Plaintiff argues in the alternative that the state's filings on behalf of defendant Vitense are "an admission that Vitense was acting under the scope of her employment." Plaintiff does not support this novel proposition and I see no logical basis for it.

19

1. <u>Substantive due process</u>

Because the "liberty" guaranteed in the Fourteenth Amendment includes freedom from personal intrusion by the government, sexual abuse by a public official may violate the substantive due process rights of the victim, or, more specifically, the right to bodily integrity.  <u>Wudtke v. Davel</u>, 128 F.3d 1057, 1063 (7th Cir. 1997); <u>see also</u> <u>McClendon v. City of Columbia,</u> 305 F.3d 314, 336 (5th Cir. 2002) ("The other circuits have also upheld the constitutional principle that there is a substantive due process right to be free from state-imposed violations of bodily integrity in cases involving rape and sexual harassment.") (collecting cases).  Thus, the question whether defendant Vitense violated plaintiff's due process rights is whether her actions may be appropriately characterized as an intrusion of a sufficiently serious magnitude to constitute a deprivation of liberty.

There are two aspects of this case that might complicate the answering of this question.  First, it appears that Vitense did not physically coerce plaintiff.  Second, Vitense denies that she had sex with plaintiff.  Because I must view the facts in the light most favorable to the nonmoving party, <u>Merillat v. Metal Spinners, Inc.</u>, 470 F.3d 685, 690 (7th Cir. 2006), plaintiff can prevail on his motion for summary judgment only if the conduct Vitense does admit constitutes a due process violation as a matter of law.

The issue of coercion is an important one.  In questions involving the intersection of

20

law and sex, the answers are often controlled by the presence or absence of consent.  When it is withheld, any sexual contact that follows certainly will be unlawful and will subject the perpetrator to severe criminal and civil penalties.  But when consent is given, not only is sexual contact generally lawful, but in some situations it is considered so fundamental to the concept of liberty that it is elevated to the status of a constitutional right.  E.g., Lawrence v. Texas, 539 U.S. 558 (2003); Eisenstadt v. Baird, 405 U.S. 438 (1972).

Thus, as in most criminal cases involving sexual contact, most claims under the due process clause  involving sex will require determining whether the plaintiff consented to the alleged conduct.  The question raised by this case is how that determination should be made when the plaintiff is a member of a group that has an impaired ability to make rational choices about his own conduct.

Unfortunately, the parties have not provided the court much assistance in making this determination.  Neither side cites any cases in which a court considered facts similar to this one in a suit by a mentally ill patient under § 1983.  Plaintiff's argument hinges on his belief that he was incapable of giving consent:  at the time of the events giving rise to this lawsuit, he had been found insane and was being held involuntarily at the institute as a result of his mental illness.  In addition, plaintiff points to Wis. Stat. § 940.225(1)(g), which makes it a crime for an employee in a facility such as the institute to have sexual contact with a patient.  Defendants advance almost no argument at all on this point, but only question

21

generally whether noncoerced sex can violate constitutional rights.  In addition, the state faults plaintiff for failing to prove that he was incapable of consent.

Neither side's position is completely satisfactory.  With respect to defendants' view, it is clearly wrong to say that any analysis of a potential violation of plaintiff's constitutional rights must begin and end with the question of coercion.  When a person is mentally unable to give consent, it makes little sense to argue that no wrong was done on the ground that no force was used.  If plaintiff were a child, it is doubtful that defendants would suggest that defendant Vitense could avoid liability with a showing that plaintiff did not put up a fight.  This is borne out by the many cases in which courts have assumed that any sexual activity between an adult public official and a minor could violate the minor's due process rights, regardless whether the adult used force.  E.g., Doe v. Smith, 470 F.3d 331, 338 (7th Cir. 2006);  Shrum ex rel. Kelly v. Kluck, 249 F.3d 773, 778 (8th Cir. 2001); Spencer v. Doe, 139 F.3d 107, 112 (2d Cir. 1998); Plumeau v. School District No. 40 County of Yamhill, 130 F.3d 432, 438 (9th Cir. 1997); Doe v. Taylor Independent School District, 15 F.3d 443, 451-52 (5th Cir. 1994) (en banc).  In none of these cases did the court consider whether the sex was "voluntary."

For plaintiff's part, the evidence on which he relies is far from conclusive.  The jury in his criminal case found him to be mentally ill for the purpose of relieving him of criminal culpability; this does not necessarily mean he is unable to make a rational choice about

22

whether or not to engage in sexual conduct.  Similarly, Wis. Stat. § 940.225(1)(g) represents a judgment by the Wisconsin legislature that employees in a mental health facility should not have sexual contact with patients.  Although the reasons for that judgment likely include the patients' diminished mental capacity, the law is less about consent and more about the relationship between the patient and care giver.  The law does not prohibit sex with a patient in all circumstances; it is silent on sexual contact between a patient and anyone other than an employee at the facility.  Thus, patients like plaintiff may be distinguished from children, who the law says are categorically incapable of consenting to sex.

One plausible model for analyzing the issue of consent in cases like this is provided by Wis. Stat. § 940.225(4), under which "a person suffering from a mental illness or defect which impairs capacity to appraise personal conduct" is presumed to be incapable of giving consent to sex.  Thus, all sexual contact is treated as nonconsensual unless the defendant can rebut the presumption with competent evidence.  Id; see also Deborah W. Denno, Sexuality, Rape and Retardation, 1997 U. Ill. L. Rev. 315, 340 (1997) ("In most state statutes, there are, among other things, two circumstances that can negate an individual's consent: (1) the person is asleep or unconscious; or (2) the person is too young, in a drugged condition, or mentally incapacitated. In either circumstance, there is a presumption that intercourse occurred by force and against the will of the victim.")

There is a colorable argument that a standard similar to the one in § 940.225(4)

23

should apply to this case.  Under such a standard, plaintiff would have to show only that he suffered from a mental illness that impaired his ability to make rational choices and perhaps that defendant Vitense knew that he was so impaired.  Daniels v. Williams, 474 U.S. 327, 332 (1986) (due process clause not violated by negligent deprivations); see also Model Penal Code Art. 213.4(2) (1962) (defining sexual assault to include sexual contact with person defendant "knows" is mentally ill).  At that point, the burden would shift to defendant to show that plaintiff could consent in fact.

The standard is a sensible one. It places responsibility on the party who knew she was engaging in sexual activity with a member of a vulnerable group, but it is sensitive to the realities of a particular case.   However, neither side addresses in their briefs whether such a standard might be appropriate and there may be reasons not to apply a state law criminal standard to a federal civil rights case.  I am reluctant to definitively adopt any particular standard on such a difficult and important question when the matter has not been fully addressed by the parties.

Although there may be room for argument on the standard governing this case, I need not resolve the issue for the purpose of this opinion.  I need decide only whether plaintiff has established as a matter of law that defendant Vitense's conduct violated his due process rights.  The above discussion makes it clear that he has not, which means that his motion for summary judgment must be denied with respect to his constitutional claim against

Vitense.

Even if I concluded that any sexual activity between plaintiff and defendant Vitense would necessarily violate his due process rights, the question would remain whether the undisputed facts show that defendant Vitense's conduct was sufficiently serious to constitute a due process violation as a matter of law. Although plaintiff alleges that Vitense had sexual intercourse with him, she says that her conduct went no further than French kissing.

Again, the parties cite no law on this question and devote little argument to it. Some guidance is provided by Alexander v. DeAngelo, 329 F.3d 912, 916-17 (7th Cir. 2003) (Posner, J.), in which the court characterized a sexual abuse claim under the due process clause as a federal law analogue to a battery claim. Although battery could apply to any offensive touching, the due process right to bodily integrity "is infringed by a serious, as distinct from a nominal or trivial, battery." Id. at 916.

In some cases, it might be clear as a matter of law whether a battery is "serious" or "trivial." Certainly, no reasonable jury could conclude that rape is a trivial battery. Doe v. Claiborne County, Tennessee, 103 F.3d 495, 507 (6th Cir. 1996) ("no rational individual could believe that sexual abuse by a state actor is constitutionally permissible under the Due Process Clause"). On the other hand, one could not conclude reasonably that all offensive touching rises to the level of a due process violation. E.g., Lillard v. Shelby County Board of Education, 76 F.3d 716, 726 (6th Cir. 1996) (rubbing of plaintiff's stomach did not

25

violate right to bodily integrity).  The facts in this case (as viewed in light most favorable to defendant Vitense) fall between those extremes.  E.g., Haberthur v. City of Raymore, Missouri, 119 F.3d 720, 724 (8th Cir. 1997) (plaintiff stated claim for due process violation by alleging that officer had fondled her breasts).  In such a case, the jury must decide whether the deprivation was sufficiently serious to constitute a due process violation.  Cf. Zentmyer v. Kendall County, 220 F.3d 805, 810 (7th Cir. 2000) (concluding that jury could determine whether medical condition was sufficiently serious to trigger constitutional protections); Jackson v. County of Racine, 474 F.3d 493, 500 (7th Cir. 2007) (allowing jury to determine whether harassment was sufficiently "severe or pervasive" to qualify as discrimination).

Because plaintiff has failed to show as a matter of law that any sexual contact between him and defendant Vitense should be treated as nonconsensual or that French kissing is a sufficiently severe intrusion to qualify as a deprivation of liberty under the due process clause, I must deny plaintiff's motion for summary judgment with respect to his claim that defendant Vitense violated his constitutional rights.

2.  State law claims

a.  Assault and battery

The issues for plaintiff's battery claim against defendant Vitense are similar to the due

26

process claim. Wisconsin law defines an assault and battery as the "unlawful and intentional subjection of another to an offensive bodily contact." WIS JI-CIVIL 2010.  However, as suggested by the court in Alexander, 329 F.3d 912, the standard for what qualifies as "offensive" is a low one.  Although the state suggests that kissing may not constitute a battery, the Wisconsin Supreme Court long ago expressed its view to the contrary.  Craker v. Chicago & N.W. Ry. Co., 36 Wis. 657 (1875); see also Wait v. Pierce, 191 Wis. 202, 209 N.W. 475, 482 (1926) ("The uninvited kiss, no matter how cold and chaste, upon the nonconsenting alabaster feme sole brow is an assault and battery, and substantial damages may be awarded for such.") Many other courts are in agreement.  Steed v. St. Paul's United Methodist Church, 728 So.2d 931, 940 (La. App. 2 Cir. 1999); M.L. v. Magnuson, 531 N.W.2d 849, 861 (Minn. App. 1995); Reeves v. Reiman, 523 N.W.2d 78, 82 (S.D. 1994); McDonald v. Ford, 223 So.2d 553 (Fla. App. 1969); see also Prosser and Keaton, The Law of Torts §§ 8, 9 (5th ed. 1984) ("Indeed, the contact and its result may be physically harmless. Thus, a person may commit a battery when intending only a joke, or a compliment – where an unappreciated kiss is bestowed without consent, or a misguided effort is made to render assistance.").  I am aware of no courts that have held to the contrary.

This leaves the issue of consent, which is an element of a battery claim. WIS JI-CIVIL 2010 (plaintiff must prove "lack of authorization" to prevail).  Again, plaintiff develops no argument that he was unable to "authorize" defendant Vitense's actions toward him for the

27

purpose an assault and battery tort.  Accordingly, I must deny plaintiff's motion for summary judgment with respect to this claim.


b. Medical malpractice

Plaintiff devotes a sole paragraph in his brief in chief to this claim, consisting of little more than a citation to the jury instruction for professional negligence by registered nurses and licensed technicians, WIS JI-CIVIL 1023.7, but plaintiff has adduced no evidence that Vitense is either of these things.  Further, the state demonstrates in its brief that a medical malpractice claim may be asserted against a "health care provider" only, which is limited in Wis. Stat. § 655.002 to a physician or a nurse anesthetist.

Although plaintiff expressly pleaded a "medical practice" claim in his complaint, he says in his reply brief that he is not suing defendant Vitense under Chapter 655, but Wis. Stat. § 893.82.  The problem with this argument is that § 893.82 does not provide a cause of action for anything, it simply imposes procedures for suing state employees.  Because plaintiff cannot sue defendant Vitense for medical malpractice and plaintiff has not advanced another viable legal theory, I will grant summary judgment in favor of defendant Vitense on plaintiff's medical malpractice claim.  (Because neither side raises this issue, I do not consider whether plaintiff could assert a claim for *common law* negligence against defendant Vitense or whether plaintiff waived such a claim by failing to identify it sooner.)

28

c.  Patients' rights statute (against both defendant Vitense and defendant State of Wisconsin)

Plaintiff points to two rights under Wisconsin's patients' rights statute that he says defendant Vitense violated: "a right to a humane psychological and physical environment within the hospital facilities" and "the right to be treated with respect and recognition of the patient's dignity and individuality by all employees of the treatment facility."  Wis. Stat. § 51.61(1)(m) and (x).  Section 51.61(7) provides a right of action "against any person, including the state . . .which willfully, knowingly and unlawfully denies or violates" either of those rights.  The state concedes that it is liable under the statute for the actions of its employees, Dft. State's Reply Br., dkt. #127, at 2, so I need not consider the state's liability under the statute separately from that of defendant Vitense.

Rights to a "humane psychological and physical environment" and to be treated with "respect and "dignity" are hardly self-defining.  Further, the parties do not cite any Wisconsin case law construing these provisions and I have not discovered any in my own research.  The Wisconsin courts have noted these rights in passing, e.g., In re Commitment of Burris, 273 Wis. 2d 294, 350, 682 N.W.2d 812, 839 (2004); St. Paul Fire & Marine Ins. Co. v. Keltgen, 260 Wis. 2d 523, 540, 659 N.W.2d 906, 914 (Ct. App. 2003), but they have yet to flesh out their meaning.  The closest case is Wright v. Mercy Hospital of Janesville, Wisconsin, Inc., 206 Wis. 2d 449, 557 N.W.2d 846 (Ct. App. 1996), in which

29

the court upheld a jury's verdict finding that a nurse's sexual relationship with a mental health patient violated the patient's right to "adequate treatment" under Wis. Stat. § 51.61(1)(f).

Although plaintiff may be able to prove a violation of Wis Stat. § 51.61(m) and (x) at trial, given his failure to develop an argument under either of these provisions, I cannot conclude that he is entitled to judgment as a matter of law.

## B. Failure to Intervene: Erin Valley

Although plaintiff failed to give notice to defendants Marshall and Dorn of his claims that they failed in their constitutional duty to protect him from defendant Vitense's sexual abuse, he did plead this claim against defendant Valley. If defendant Vitense's conduct violated plaintiff's constitutional rights, it follows that defendant's Valley's failure to act violated plaintiff's rights as well. A public employee may be liable under § 1983 for failing to intervene to stop the constitutional violation committed by another employee. George v. Smith, 507 F.3d 605, 609-10 (7th Cir. 2007); Fillmore v. Page, 358 F.3d 496, 505-06 (7th Cir. 2004); Windle v. City of Marion, 321 F.3d 658, 663 (7th Cir. 2003). This duty extends to supervisory and nonsupervisory officials alike, but it is limited to those situations in which the defendant has a reasonable opportunity to prevent the violation. Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994).

30

Defendant Valley says that plaintiff has not adduced sufficient evidence to show that she knew of defendant Vitense's sexual abuse, but this argument simply is not tenable. Plaintiff testified that he looked straight into defendant Valley's eyes when Vitense was having intercourse with him.  Although Valley is entitled to take the position that she did not realize what was happening, I do not agree that it would be "speculation" to believe that she did.  It is genuinely disputed as well whether Valley acted as a "look out" for Vitense while she was having sex with plaintiff.  If Valley was complicit in Vitense's actions, Valley could be held liable under a conspiracy theory.  Jones v. City of Chicago, 856 F.2d 985, 992 (7th Cir. 1988) ("To be liable as a conspirator . . . [i]t is enough if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them.")  Viewing the facts in the light most favorable to plaintiff, a reasonable jury could find Valley liable under either theory.

Unlike defendant Vitense, defendant Valley raises a qualified immunity defense, which requires a court to determine whether a defendant had a "fair warning" that her actions (or inactions) violated the Constitution.  Hope v. Pelzer, 536 U.S. 730, 739 (2002); Alexander v. City of Milwaukee, 474 F.3d 437, 443 (7th Cir. 2007).  It was clearly established in 2006 in this circuit both that sexual abuse by a public employee violates a person's constitutional right to bodily integrity and that public employees have a duty to intervene to prevent constitutional violations of other employees.  However, as the

31

discussion of plaintiff's claim against defendant Vitense demonstrates, plaintiff has not shown that it was clearly established that defendant Vitense's conduct constitutes sexual abuse for the purpose of the due process clause.  Because plaintiff's due process claim against defendant Vitense is legally uncertain, I cannot conclude that defendant Valley had fair warning that her failure to intervene to stop Vitense would violate the Constitution. Accordingly, I conclude that defendant Valley is entitled to qualified immunity and I will grant her motion for summary judgment.

### C. Sexual Harassment: Patricia Dorn

Plaintiff alleges that defendant Dorn subjected him to a continuous litany of sexual harassment, including graphic verbal abuse as well as acts of indecent exposure and inappropriate physical touching. He contends that Dorn's conduct violated his right to equal protection of the laws because she harassed him because of his sex.  Although plaintiff points to little specific evidence that Dorn harassed him because he was a man, it is reasonable to infer that sexual harassment is discrimination because of sex unless the record identifies another motivation for the mistreatment. Compare Hardy v. University of Illinois at Chicago, 328 F.3d 361 (7th Cir. 2003) (assuming that sexual advances were because of sex), and Rogers v. City of Chicago, 320 F.3d 748, 753 (7th Cir. 2003) (assuming that sexually explicit comments by male to female were because of sex), with Rizzo v. Sheahan, 266 F.3d

705 (7th Cir. 2001) (although defendant's comments were both sexually explicit and severe, no Title VII liability because facts showed that harassment was based on animosity defendant felt for plaintiff's husband rather than her sex).

Defendant Dorn does not argue that her alleged conduct was not sufficiently "severe or pervasive" to violate the equal protection clause. <u>Baskerville v. Culligan International Co.</u>, 50 F.3d 428, 430 (7th Cir. 1995). Rather, her only argument in support of her motion for summary judgment on this claim is that plaintiff did not plead it, but I disagree. In his complaint, plaintiff alleged that Dorn "intentionally sexually harassed him" and he included a long list of allegedly harassing acts. Although it is true that plaintiff did not specifically identify an equal protection theory in his complaint, he was not required to do so. Rule 8 requires a plaintiff to plead *facts* not the law. <u>Jogi v. Voges</u>, 480 F.3d 822, 826 (7th Cir. 2007). "If [defendant Dorn] wished to minimize uncertainty concerning the scope of [plaintiff']s claims, [she] could have served contention interrogatories." <u>Vidimos, Inc. v. Laser Lab Ltd.</u>, 99 F.3d 217, 222 (7th Cir. 1996). Accordingly, defendant Dorn's motion for summary judgment will be denied with respect to plaintiff's claim that she sexually harassed him in violation of the equal protection clause.


D. <u>Retaliation</u>

An initial question relating to plaintiff's retaliation claims is which actions plaintiff

33

believes were retaliatory.  Most of the discussion in the retaliation section of his brief consists of his evidence of a retaliatory motive.  (Plaintiff vaguely alleges in his proposed findings of fact that he "felt" he had to beg and "humiliate" himself to receive treatment from defendant Vitacco. Plt.'s PFOF ¶ 90, dkt. #105.  To the extent plaintiff intends to argue that any reluctance by Vitacco to treat plaintiff is retaliatory, I conclude that his evidence is far from sufficient to meet the requirement of Fed. R. Civ. P. 56 "to set out specific facts showing a genuine issue for trial."  Payne v. Pauley, 337 F.3d 767, 773 (7th Cir. 2003).)

The only actions plaintiff singles out specifically are his placement and retention in the maximum security unit in 2006.  I agree with defendants that plaintiff cannot challenge his initial placement because it is undisputed that plaintiff's transfer to maximum security was a response to the investigation of the relationship between defendant Vitense and plaintiff.  Plaintiff does not challenge defendant Pollock's testimony that Pollock placed plaintiff in a maximum security unit instead of another medium security unit because there was no room in the other medium security units.

Although plaintiff suggests that he was being unfairly punished for Vitense's misconduct, even if that were true it would not support his claim.  Obviously, to prevail on a claim for retaliation under the First Amendment, it is not enough to show that defendants treated him unfairly; he must show that they mistreated him because of his exercise of a First Amendment right. Mt. Healthy Board of Education v. Doyle, 429 U.S. 274, 287 (1977).

Even if defendants did blame plaintiff for what happened with Vitense, this would not provide a basis for a § 1983 lawsuit unless plaintiff's conduct with Vitense was constitutionally protected, a proposition that even plaintiff does not advance.

This leaves plaintiff's retention in the maximum security unit. Although plaintiff's proposed findings of fact could be clearer and more specific regarding the differences between the medium security units and the maximum security units, I need not consider whether the difference would be sufficient to deter "a person of ordinary firmness" from exercising his constitutional rights, Pieczynski v. Duffy, 875 F.2d 1331, 1333 (7th Cir. 1989), because defendants have not moved for summary judgment on that ground, Sublett v. John Wiley & Sons, Inc., 463 F.3d 731, 736 (7th Cir. 2006).

The only issues raised by defendants are whether they were personally involved in the decision to retain plaintiff in maximum security and whether plaintiff adduced sufficient evidence to allow a reasonable jury to infer that they were motivated by his criticism of the institute in making that decision. Morfin v. City of East Chicago, 349 F.3d 989, 1001 (7th Cir. 2003). With respect to personal involvement, plaintiff testified that Smith and Vitacco made comments about keeping him in the maximum security unit and that Vitacco in particular expressed a disturbing degree of hostility toward plaintiff's criticism of the institute, but plaintiff adduced no evidence that either Smith or Vitacco played any role in deciding where plaintiff was housed. A negative opinion is not retaliation in and of itself,

35

no matter how strongly that opinion is held.  Because plaintiff has failed to identify any retaliatory actions that Vitacco or Smith may have taken, I must dismiss the complaint as to those defendants.

I cannot come to the same conclusion with respect to defendants Siggelkow, Van Rybroek and Pollock.  Although defendants argue that Siggelkow was the "final" decision maker for determining plaintiff's housing status, the facts show that Pollock had authority to transfer patients subject to Siggelkow's approval and that Van Rybroek had authority to overrule Siggelkow's decisions.  This is sufficient to show that Pollock and Van Rybroek may have been personally involved in the decision.  Johnson v. Johnson, 385 F.3d 503, 527 (5th Cir. 2004); Jones v. City of Chicago, 856 F.2d 985, 993-94 (7th Cir. 1988).

With respect to plaintiff's evidence of a retaliatory motive, plaintiff testified that each of these three defendants made comments to him that either bluntly acknowledged that his "complaints" and "grievances" were the reason he was being kept in the maximum security unit or strongly implied as much.  Babcock v. White, 102 F.3d 267, 275 (7th Cir. 1996) (statement by defendant to prisoner to "stop filing all that shit" was sufficient to require trial on prisoner's claim that he was transferred to less desirable prison in retaliation for exercising his First Amendment right to file grievances).  Defendants advance legitimate reasons for retaining plaintiff in the maximum security unit, such as plaintiff's refusal to cooperate in the investigation, but I cannot conclude as a matter of law that defendants'

36

version is the correct one.  <u>Spiegla v. Hull</u>, 371 F.3d 928 (7th Cir. 2004)(once plaintiff adduces evidence of retaliatory motive, burden shifts to defendant to show that he would have taken the same action anyway).  A jury will have to determine what defendants' true motives were. (Because no party raises the question whether plaintiff's criticism of the institute is constitutionally protected activity, I do not consider it.)

## E. <u>Access to Courts</u>

I agree with defendants that plaintiff cannot prevail on his claim for a denial of his right of access to the courts because he has no evidence of an actual injury.  The Supreme Court held in <u>Lewis v. Casey</u>, 518 U.S. 343 (1996), and <u>Christopher v. Harbury</u>, 536 U.S. 403, 414-415 (2002), that a plaintiff has no standing to bring such a claim unless he identifies a lawsuit that has been frustrated or impeded by the defendants' conduct.  In his brief, plaintiff says that an injury should be inferred by virtue of the number of times he was denied time with his lawyer.  It is unlikely that such a conclusory allegation would withstand even a motion to dismiss.  <u>Christopher</u>, 536 U.S. at 414-14 ("[T]he underlying cause of action [that was impeded] is an element *that must be described in the complaint*.") (emphasis added).  It is certainly not enough to defeat a motion for summary judgment.

## ORDER

IT IS ORDERED that

1. Defendant State of Wisconsin's motion to "strike" plaintiff Dennis Strong's statement of facts in his response brief, dkt. #133, is DENIED as unnecessary.

2. Plaintiff's motion to "strike" defendant State of Wisconsin's summary judgment materials submitted on behalf of defendant Kelly Vitense, dkt. # 130, is DENIED.

3. Plaintiff's motion for summary judgment, dkt. #103, is DENIED. Summary judgment is GRANTED to defendant Vitense on plaintiff's claim that Vitense committed medical malpractice.

4. The motion for partial summary judgment filed by defendant State of Wisconsin, dkt. #90, is GRANTED. Plaintiff's complaint is DISMISSED as to any claims against the state for violations of Wis. Stat. § 51.61 with respect to the actions of any defendant except defendant Vitense.

5. The motion for summary judgment filed by defendants Michael Vitacco, Fred Siggelkow, Greg Van Rybroek, David Pollock and Brad Smith, dkt. #93, is DENIED with respect to plaintiff's claim that defendants Siggelkow, Van Rybroek and Pollock retaliated against plaintiff for exercising his First Amendment rights by retaining him in the maximum security unit. The motion is GRANTED in all other respects. Plaintiff's complaint is DISMISSED as to defendants Vitacco and Smith.

6. The motion for summary judgment filed by defendant Patricia Dorn, dkt. #83,

38

is DENIED with respect to plaintiff's claim that defendant Dorn sexually harassed him in violation of the equal protection clause.  The motion is GRANTED in all other respects.

7.  The motion for summary judgment by filed by defendant Cheryl Marshall, dkt. #84, is GRANTED.  Plaintiff's complaint is DISMISSED as to defendant Marshall.

8.  Defendant Erin Valley's motion for summary judgment, dkt. #99, is GRANTED. Plaintiff's complaint is DISMISSED as to defendant Valley.

Entered this 4th day of April, 2008.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge